William LAWHORN and Cecil
Cox, Appellants,

v.

STATE of Indiana, Appellee.

No. 481S104.

Supreme Court of Indiana.

Aug. 29, 1983.

Susan K. Carpenter, Public Defender, David P. Freund, Deputy Public Defender, Indianapolis, for appellant Lawhorn.

J. Richard Kiefer, Indianapolis, for appellant Cecil Cox.

Linley E. Pearson, Atty. Gen., Joseph N. Stevenson, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Defendants-Appellants William Lawhorn and Cecil Cox were found guilty by a jury in the Bartholomew Superior Court of dealing in cocaine, a class A felony. The trial judge sentenced each to a term of thirty years. Appellants now directly appeal. The first issue presented for our consideration claims that the trial court erred by sentencing Appellants on a class A felony rather than on a class B felony due to the actual weight of pure cocaine delivered. This is the only issue raised by Appellant Cox. Appellant Lawhorn raised this issue and also presented several other issues. Lawhorn admitted that some of his issues are without merit and accordingly waived them. Additional issues presented for our review are:

2. whether the trial court erred by denying Lawhorn's motion to suppress certain evidence;

3. whether Lawhorn's conviction is supported by sufficient evidence;

4. whether the trial court erred by denying Lawhorn's motion for mistrial; and

5. whether the trial court erred by ruling that State's witness Huttsell was qualified to give expert testimony.

The facts most favorable to the trial court's judgment indicate that Roger Billings of Columbus, Indiana, approached the United States Drug Enforcement Agency (DEA) in 1979 and reported that he was aware of an illegal drug problem in Columbus. Specifically, Billings informed that William Lawhorn was dealing in all types of drugs on a large scale. Billings was especially interested in stopping the illegal drug traffic in Columbus since his son had nearly died from a drug overdose. Billings stated his willingness to act as a confidential informant with the DEA to help stop the illegal drug traffic. The DEA referred Billings to the Columbus Police Department where John Myers of the Narcotics and Vice Division worked with him. Myers directed Billings to visit Lawhorn, under cover, at 818 Lafayette Avenue in Columbus. Lawhorn lived there with the owner, Cindy Burton, who was Lawhorn's fiancee. Billings visited the address as many as ten or eleven times, each time wearing a body microphone and transmitter set. A listening post for the radio receiver unit was established in a third story room in the First Methodist Church across the street from Burton's house. This post also gave police a clear view of the parking lot used by Lawhorn and his guests and of the front door and other approaches to the house. Each time Billings visited 818 Lafayette, he first reported to the narcotics office maintained by the Columbus Police Department, then walked to his car and proceeded directly to the address. Each conversation in the house was monitored by Detective Myers and Officer Robert S. Clark who stationed themselves in the church building. Clark recalled that there were approximately twelve visits. He also stated that the radio transmitter, antennae, receiver and tape recorder were in good working order. Tapes

were made of the conversations between Billings, Lawhorn and Cox. Said conversations discussed drug trafficking in general and certain illegal sales in particular. These tapes were played for the jury over objection by both Appellants.

## I

Appellants were both convicted of the crime described in Ind.Code § 35–48–4–1 (Burns Supp 1982). Said section penalizes, according to weight, a person who "Knowingly or intentionally manufactures or delivers cocaine or a narcotic drug, *pure or adulterated,* classified in schedule I or II" (emphasis added). The offense is a class A felony if the amount of drug involved weighs three grams or more.

The undisputed evidence adduced at trial showed that the substance delivered by Cox to Billings at Lawhorn's instruction weighed 6.617 grams and contained 35.2 per cent pure cocaine. The pure cocaine portion of the delivered substance thus weighed approximately 2.3 grams. Cox maintains that the trial court erred by overruling his motion to dismiss on the basis that the weight of the seized, pure cocaine does not support a class A felony conviction. Lawhorn likewise claims that the undisputed evidence regarding the quantity of seized, pure cocaine cannot support a class A felony, thirty year sentence. Both Appellants concede that a class B felony conviction could be sustained by this evidence.

Appellants now claim that the Legislature intended an enhanced punishment only when the seized pure cocaine or narcotic drug classified in schedule I or II equals three grams or more. They further argue that if the Legislature intended an enhanced sentence when the weight of the total amount seized upon delivery equals three grams or more, regardless of the actual pure drug content in the seized amount, then such classification was unconstitutional. Appellants concede that this Court held to the contrary in *Hall v. State,* (1980) Ind., 403 N.E.2d 1382. In *Hall,* fifty-eight grams of substance was delivered and no analysis was made to determine the amount of pure

cocaine contained therein. Appellant Hall argued that there was insufficient proof that the substance contained ten grams of pure heroin. We found no insufficiency in that evidence. We reach the same result here.

■ The first sentence of Ind.Code § 35–48–4–1 clearly states that a crime is committed when a person knowingly or intentionally delivers cocaine or a pure or adulterated drug classified in Schedule I or II. Appellants argue that the second sentence of this statute makes the offense a class A felony only if the actual amount of drug involved weighs three grams or more. They contend that since this second sentence does not explicitly stipulate pure or adulterated drug, the Legislature intended that only the pure drug was to be considered. We see no merit to this argument. The antecedent of "drug" in the second sentence is the drug discussed in the first sentence which is "narcotic drug, pure or adulterated." We would be straining the language or intention of the Legislature to interpret this statute to mean a different analytical weight in each sentence. This statute and all those involving controlled substance dealing utilizes the weight of the entire substance delivered by the dealer. This is the statutory meaning as well as the usage and meaning common in drug trafficking. Appellants and those with whom they dealt treated these transactions as cocaine sales of the aggregate weight of the substance. The Legislature clearly intended to use that same weight in affixing the penalties herein involved.

■ Appellants also claim that this interpretation would make Ind.Code § 35–48–4–1 unconstitutional. Specifically, they argue that the statute would be unconstitutional because it would unequally penalize persons who sell identical amounts of pure cocaine—the inequality based on whether the cocaine was mixed with enough other substance to make an aggregate weight in excess of three grams. We find no merit in this argument. We held in *Hall, supra,* that when the issue involves dealing in controlled substances, the proper test is one of

the rational basis for the statutory interpretation. *Hall,* 403 N.E.2d at 1387. The federal courts also have found that due to the societal harm posed by cocaine, the rational basis standard is proper to test the classification's relationship to a state penal and regulatory purpose. *United States v. Castro,* (N.D.Ill.1975) 401 F.Supp. 120; *United States v. Brookins,* (D.N.J.1974) 383 F.Supp. 1212; *see also United States v. Carolene Products,* (1938) 304 U.S. 144, 58 S.Ct. 778, 82 L.Ed. 1234. The primary state interest served by drug dealing statutes is not simply the harm caused by a particular dosage, but the societal harm caused by the dealing itself. We need not burden this opinion with the details of that societal harm since it is well known in all areas of our society and amply discussed in the cases cited immediately above. We find no reversible error on this issue.

## II

■ At trial, Appellant Lawhorn objected to the admission of State's Exhibits I, III, IV–a and IV–b which were police recordings of conversations between Billings and persons in Lawhorn's residence, including Lawhorn and Cox. Lawhorn now claims that the admission of said Exhibits violated his rights under the 4th, 5th and 14th Amendments of the United States Constitution and under the corresponding sections of the Indiana Constitution. Specifically, Lawhorn claims that his 5th Amendment rights were violated by Billings who elicited incriminating statements from him without first warning him pursuant to *Miranda v. Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. Lawhorn acknowledges that this Court held squarely against his position in *Adams v. State,* (1979) 270 Ind. 406, 386 N.E.2d 657, but now asks us to reconsider. In *Adams,* we recognized that the procedural safeguards of *Miranda* apply only to custodial interrogations. Since the United States Supreme Court mandated *Miranda* warnings to dispel the compulsion inherent in custodial surroundings wherein no statement obtained from a defendant can truly be the product of his free choice, we reject the notion that because a police agent elicited certain incriminating statements in a noncustodial conversation, *Miranda* warnings were required. We come to the same conclusion here. The statements were non-custodial and thus no *Miranda* warnings were required.

■ The second basis for seeking suppression of the contested tapes was the proposition that the broadcast and recording of private conversations from a microphone and transmitter carried by a consenting participant in the conversation violates the rights of the other participants against unreasonable searches and seizures guaranteed by the Fourth Amendment to the U.S. Constitution and by Art. I, § 11 to the Indiana Constitution. The U.S. Supreme Court decided this issue against Lawhorn's position in *United States v. White,* (1971) 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453. The Court there held that since the witness could testify to these conversations, no constitutional right was violated by allowing them to be presented by recordings taken at the time of the conversations. Justice White specifically stated:

"... we are not prepared to hold that a defendant who has no constitutional right to exclude the informer's unaided testimony nevertheless has a Fourth Amendment privilege against a more accurate version of the events in question.

It is thus untenable to consider the activities and reports of the police agent himself, though acting without a warrant, to be a 'reasonable' investigative effort and lawful under the Fourth Amendment but to view the same agent with a recorder or transmitter as conducting an 'unreasonable' and unconstitutional search and seizure...."

*United States v. White,* 401 U.S. at 753, 91 S.Ct. at 1127, 28 L.Ed.2d at 459. The Seventh Circuit Court of Appeals subsequently followed *White* by holding that a defendant's Fourth Amendment rights are not violated when that defendant's conversations with a government informant are electronically monitored by a government agent

with the consent of the informant. *United States v. Hodge,* (7th Cir.1979) 594 F.2d 1163, 1167. This same result also was reached by our Court of Appeals in *McCarty v. State,* (1975) 167 Ind.App. 396, 338 N.E.2d 738, *Trans. denied* (1976). We therefore find no error on this issue.

### III

Appellant Lawhorn next asks us to find insufficient evidence to sustain his conviction since the evidence allegedly showed that the drug transaction precipitating this case was not a "controlled buy." Lawhorn's contention is that since this buy was not "controlled," the informant's testimony could not have been sufficient to sustain the conviction. The evidence showed that Billings was strip-searched before he left the narcotics and vice office and again upon his return there. Police officers testified as to the articles found on his person when he left the office and when he returned. Billings' car was not searched, however, due to fears that such a search would endanger Billings. The police felt that due to the number of contacts and the size of the operations indicated in the conversations with Billings at Lawhorn's residence, Billings might be followed or otherwise watched and his personal safety would be in jeopardy if police were seen examining his car. There was a time period when Billings was out of police contact because the place he had to go to obtain cocaine was out of the range of their radio equipment. Billings himself testified as to the details of the buy.

In sufficiency matters, this Court does not reweigh the credibility of the witnesses. *Rose v. State,* (1983) Ind. 446 N.E.2d 598. We consider only the evidence most favorable to the State with all reasonable inferences drawn therefrom to determine whether a reasonable juror could have found the existence of each element of the charged crime beyond a reasonable doubt. This Court will not supplant the jury's assessment of the subjective matter of a witness' credibility. *Thomas v. State,* (1981) Ind., 428 N.E.2d 231. Moreover, a conviction may be sustained upon the uncorroborated testimony of one witness. *Collins v. State,* (1981) Ind., 429 N.E.2d 623; *Pavone v. State,* (1980) Ind., 402 N.E.2d 976, *reh. denied.* In this case, Billings' testimony established each element of the offense charged against Cox and Lawhorn. All evidence about negotiations and delivery instructions were recorded and played back to corroborate Billings' testimony. These recordings were made under police supervision. Although the actual buy occurred elsewhere and the only direct evidence of it is Billings' uncorroborated testimony, it was for the jury to determine Billings' credibility and they chose to believe him. We accordingly find that there was sufficient evidence before the jury to justify the verdict it reached.

### IV

The tapes relating Billings' conversations with Appellants and others at Lawhorn's Lafayette Street residence were edited by the trial judge and the trial counsels involved in this case. Certain portions of said tapes were ordered stricken such that these parts would not be played to the jury. At one point when a tape was reversed, a portion meant to be cut was mistakenly played to the jury. The portion inadvertently played to the jury contained the following statement by Billings: "That guy just left with seventeen hundred dollars worth of cocaine. Brian Cummings." The mistake was recognized, the tape was stopped and Appellant moved to strike. The State stipulated to the motion stating that the playback was inadvertent. The trial court then admonished the jury to disregard that part of the tape. Shortly thereafter the jury was sent out for the day and Appellant moved for a mistrial, which was denied. Appellant subsequently decided against having the jury further admonished despite the trial court's offer to do so when the jury returned the next morning. Appellant now contends that the trial court committed reversible error by not declaring a mistrial.

The granting of a mistrial is largely within the sound discretion of the trial court and should be granted only when, considering all of the circumstances, the defendant has been placed in a position of grave peril to which he should not have been subjected. *Chandler v. State,* (1981) Ind., 419 N.E.2d 142. No reversible error will be found if the jury is admonished by the judge to disregard what occurred or if other reasonable curative measures are taken. *Tinnin v. State,* (1981) Ind., 416 N.E.2d 116. Of course, the defendant must make a timely objection to preserve any alleged error. Here Appellant first acquiesced in the trial court's admonishment to the jury and only later moved for a mistrial. Appellant subsequently declined the opportunity to have the jury further admonished. We find no error on this issue. Appellant does not point out, nor does the record disclose, how he was prejudiced by this one statement. Moreover, Brian Cummings was not identified in the tape and nothing further was said of this statement during trial. Billings' statement did not even indicate that Appellants were present when made although Billings was at Lawhorn's residence. The recorded conversations which were properly played to the jury were even more prejudicial to Appellants than was this statement in that the properly played conversations contained direct discussion between Appellants and Billings about selling cocaine and trafficking in other drugs. There is no showing that Appellant Lawhorn was placed in grave peril such that a mistrial was justified. *Cambridge v. State,* (1981) Ind., 428 N.E.2d 1252, *reh. denied* (1982).

## V

Freddy Lee Huttsell was a chemist who had worked at the Indiana State Police Headquarters identifying drugs since 1974. He analyzed the drugs in this case and testified as an expert witness on their composition. Appellant objected to Huttsell's qualifications as an expert on the subject because Huttsell had not taken college courses in pharmaceutical chemistry and plant toxonomy, the science of plant classifications. Appellant believes the later study essential since cocaine comes from the leaves of the coca tree, a plant.

The determination of whether a witness is qualified to testify as an expert is within the sound discretion of the trial court. The trial court's ruling will not be disturbed absent an abuse of discretion. The qualifications of an expert may be established by practical experience or formal training. *Balfour v. State,* (1981) Ind., 427 N.E.2d 1091, *reh. denied; Copeland v. State,* (1982) Ind.App., 430 N.E.2d 393. Huttsell testified that he received a B.S. in chemistry and a M.S. in organic chemistry from Purdue University. He also testified that he had attended various DEA forensic chemistry seminars and seminars and training programs offered by instrumentation companies such as a training session on computerized gas chromatography given by the Hewlitt-Packard Corporation. He had completed courses in biochemistry and analytical chemistry and testified that pharmaceutical chemistry, which he had not studied, is more directed to the "senses" of drugs than to their analysis. Huttsell also had "on the job" training in applying chemistry to identify drugs. He had made over 10,000 individual analyses of materials alleged to be controlled substances. Huttsell described in minute detail the method he used to test unidentified substances such as those in this case. There was sufficient evidence before the trial court to justify it in finding that Huttsell was qualified to testify as an expert witness on the subject of drug analysis.

Appellant Lawhorn raised in his Motion to Correct Errors issues of the State's violation of a discovery order and the trial judge's denial of a motion for change of venue from the county. In Lawhorn's brief, however, he conceded that there were no legal grounds for maintaining these issues and waived review of them. In addition, he questioned several instructions tendered by him and refused by the trial court but conceded that at least some of his proposed instructions were improper state-

ments of the law and, more significantly, that the trial court had given its own instructions covering the subject area. Lawhorn therefore waived argument and submission of those issues.

The trial court is in all things affirmed.

GIVAN, C.J., and HUNTER, DeBRULER and PRENTICE, JJ., concur.